STATE of Wisconsin, Plaintiff-Respondent,

v.

Brandon L. WHEAT, Defendant-Appellant.†

Court of Appeals

*No. 01–2224–CR. Submitted on briefs April 12, 2002.—Decided May 15, 2002.*

2002 WI App 153

(Also reported in 647 N.W.2d 441.)

† Petition to review denied 7-26-02.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Steven A. Koch* and *Bradley J. Lochowicz* of *Seymour, Kremer, Nommensen, Morrissy & Koch, L.L.P.,* Elkhorn.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jennifer E. Nashold*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

¶ 1. SNYDER, J. Brandon L. Wheat appeals from a judgment of conviction for possession of cocaine with intent to deliver and an order denying his request for postconviction relief based upon ineffective assistance of counsel. Wheat argues that his trial defense counsel was ineffective because he failed to timely file a motion to suppress evidence found during a probation search of Wheat's home. We conclude that trial defense counsel's performance did not prejudice Wheat's defense and therefore does not amount to ineffective assistance of counsel. We therefore affirm the judgment of conviction and order denying postconviction relief.

## FACTS

¶ 2. On May 30, 2000, Kenosha county probation agent Jennifer Merlin received a phone message from City of Kenosha police officer Twain Robinson concerning Wheat. At that time, Wheat was on probation and Merlin was his probation agent.

¶ 3. Robinson informed Merlin that he had had contact with Wheat that day. Sometime between 3:00 and 4:00 p.m., Robinson was driving a marked squad car eastbound on 57th Street in Kenosha, a known drug trafficking area, and saw a man later identified as Wheat leaning inside a car window. When Wheat and the occupant of the car saw Robinson, they both immediately went their separate ways. Robinson noticed that as Wheat was walking east on 57th Street, he was "walking kind of strange. His left arm wasn't moving. It

wasn't swinging normally like in a normal walk." Robinson thought perhaps Wheat was trying to conceal something under his jacket so he continued to observe him.

¶ 4. Robinson circled around the block while Wheat continued northbound on 16th Avenue. By the time Robinson completed the circle around the block, Wheat had "disappeared." Robinson thought perhaps Wheat had done something illegal and was trying to avoid police contact so he circled the block again. Wheat had reappeared, headed in the same direction. Robinson then decided to stop Wheat and question him. Robinson conducted a pat-down for weapons and instead of weapons found 75 to 100 baggies, a cell phone and a pocket calculator/organizer in Wheat's possession. Robinson did not find any weapons or illegal drugs on Wheat and released him. During this phone call, Robinson did not ask Merlin to do anything but merely provided her with the information.

¶ 5. As part of the rules of Wheat's probation, he agreed not to possess or consume any controlled substances; he also agreed to contact his probation agent if he had any police contact. Wheat had a history of drug use and during a previous search of his home, Merlin had discovered items commonly used to package drugs, several beepers and one or two cell phones. Based upon Wheat's history and Robinson's phone call, Merlin discussed with her supervisors the appropriate action to take and received approval to conduct a search of Wheat's home.

¶ 6. On June 6, 2000, Merlin met with Wheat at the Department of Probation and Parole and discussed Robinson's phone call with him. She informed Wheat that she wanted a urine sample from him and instructed him to wait in the lobby area while she

275

completed the appropriate paper work. After completing the paper work, approximately ten minutes later, Merlin returned to the lobby to discover that Wheat was gone. Merlin updated her supervisor, called law enforcement's gang unit to inform them of what occurred and asked them to pick up Wheat. She also informed law enforcement that she and probation agent Lori Wells were going to Wheat's residence to see if he was there. Officer Wilkinson indicated that he and officer Falk would meet Merlin and Wells at Wheat's home.

¶ 7. After meeting the officers at Wheat's house, Merlin received a message that Wheat had returned to Merlin's office. Merlin returned to her office and a urine sample was obtained from Wheat. Merlin then took Wheat back to his residence to conduct a home search. Merlin viewed Wheat's flight as suspicious and as a factor in deciding to conduct a search of his home.

¶ 8. When Merlin arrived at Wheat's home, the officers were still there. Merlin, Wells and the officers entered the house and Merlin searched Wheat's bedroom; between his mattresses, Merlin found a bag that contained several gem bags, commonly used for packaging drugs. In the speaker on his dresser, she found an empty baggie and in another speaker, she found approximately $140 cash.

¶ 9. At no time did the officers search the residence but instead stood in the kitchen with Wheat. While in the kitchen, Wilkinson informed Merlin and Wells that whenever anyone got near the basement, Wheat appeared nervous. Based upon that, Wilkinson recommended that the agents consider searching the basement but did not order the agents to do so. Merlin later testified that she intended to search the basement prior to Wilkinson's comment. Merlin and Wells, accom-

panied by officer Falk, searched the basement where, inside another speaker, they found a bag of crack cocaine and a cell phone. Merlin then placed a probation hold on Wheat and the officers assisted her in taking Wheat into custody.

¶ 10. On June 16, 2000, Wheat was charged with possession of cocaine with intent to deliver within 1000 feet of a school as a drug repeater. A June 26, 2000 information charged the same. On September 6, 2000, Wheat filed a motion to suppress all the evidence discovered during the search of his home. The trial court did not address the motion because it was untimely filed. On September 11, 2000, Wheat's trial defense counsel, Attorney William P. Michel III, moved to withdraw as counsel for providing Wheat ineffective assistance of counsel. However, after discussions with Wheat, Michel remained as counsel.

¶ 11. A jury trial was held on October 16 and 18, 2000. Before the conclusion of the jury trial, Wheat accepted the State's plea offer and pled guilty to possession of cocaine with intent to deliver. Wheat was sentenced to one year in prison and eight years' extended supervision, consecutive to a sentence in another case.

¶ 12. On May 8, 2001, Wheat filed a motion for postconviction relief alleging ineffective assistance of counsel. After a hearing, the trial court denied Wheat's motion.

## DISCUSSION

¶ 13. Wheat alleges that his trial defense counsel's failure to file a timely suppression motion constitutes ineffective assistance of counsel. Wheat specifically asserts that trial defense counsel's failure to file a suppression motion resulted in actual prejudice because

the results of an illegal search of his residence were introduced as evidence at trial. Wheat contends that the probation search conducted at his residence was illegal because Merlin was a "stalking horse" for the police who initiated the search based upon evidence discovered during an illegal pat-down search. We disagree.

¶ 14. Wheat has a Sixth Amendment right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *State v. Eckert*, 203 Wis. 2d 497, 506, 553 N.W.2d 539 (Ct. App. 1996). In order to prove that he has not received effective assistance of counsel, Wheat must show two things: (1) that his lawyer's performance was deficient; and (2) that this deficient performance prejudiced his defense. *Eckert*, 203 Wis. 2d at 506. The issues of performance and prejudice present mixed questions of law and fact. *Id.* at 507. Findings of historical fact by the trial court will not be upset unless they are clearly erroneous. *Id.* The questions of whether counsel's behavior was deficient and whether it was prejudicial to Wheat are questions of law in which we need not defer to the trial court. *State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985). Wheat has the burden to establish both components. *State v. Smith*, 207 Wis. 2d 258, 273, 558 N.W.2d 379 (1997). Failure to raise an issue of law is not deficient performance if the legal issue is later determined to be without merit. *See State v. Reynolds*, 206 Wis. 2d 356, 369, 557 N.W.2d 821 (Ct. App. 1996).

¶ 15. The determination of whether a search is a police or probation search is a question of constitutional fact reviewed according to a two-step process. *State v. Hajicek*, 2001 WI 3, ¶ 2, 240 Wis. 2d 349, 620 N.W.2d 781. First, we review the circuit court's findings of

278

historical fact under the clearly erroneous standard. *Id.* Second, we review the circuit court's determination of constitutional fact de novo. *Id.*

¶ 16. The trial court found that the search was instigated by the probation officer and not by law enforcement. Information was provided by Robinson to Merlin regarding Robinson's contact with Wheat merely as a courtesy and as part of normal operating procedure. Wheat had a history of controlled substance use; in the past, Merlin had discovered similar items in his possession and had conducted previous searches based on controlled substance use. At that time, Wheat had indicated that these items were from his past drug dealing days but he was no longer engaged in that activity. Wheat had a prior positive urinalysis; Merlin had brought Wheat in for another urinalysis and asked him to wait in the lobby but Wheat fled. Merlin talked the situation over with her supervisors and the search of Wheat's residence was done at the insistence of the probation officer. The trial court found that Wilkinson and Falk were there for the sole purpose of securing the premises and while Falk may have gone downstairs at some point, in essence law enforcement just stood around and did not participate in the search. There is support in the record for all of these findings and they are not clearly erroneous.

¶ 17. We now apply de novo review to the trial court's conclusion that the search of Wheat's residence was a probation search. *See id.* at ¶ 29. As part of the rules of Wheat's probation, he agreed not to possess or consume any controlled substances; he also agreed to contact his probation agent if he had any police contact. Wheat had a history of drug use and a past positive

urinalysis; during a previous search of Wheat's home, Merlin discovered items commonly used to package drugs, several beepers and cell phones. Based upon Wheat's history and Robinson's phone call, Merlin discussed with her supervisors the appropriate action to take and received approval to conduct a search of Wheat's home.

¶ 18. Merlin met with Wheat and discussed Robinson's phone call with him. She informed Wheat that she wanted a urine sample from him and instructed him to wait in the lobby area while she completed the appropriate paper work. After completing the paper work, less than ten minutes later, Merlin returned to the lobby to discover that Wheat was gone. After receiving approval for the search, Merlin then called law enforcement to let them know what happened and ask them to pick up Wheat. She also informed law enforcement that she and probation agent Wells were going to Wheat's residence. Wilkinson indicated that he and Falk would meet Merlin and Wells there. Merlin viewed Wheat's flight as suspicious and it was a factor in deciding to conduct a search of his home.

¶ 19. When Merlin and Wells arrived at Wheat's home, the officers were there and had not entered the house. Merlin searched Wheat's bedroom. At no time did the officers search the residence but instead stood in the kitchen with Wheat. While in the kitchen, Wilkinson informed Merlin and Wells that whenever anyone got near the basement, Wheat appeared nervous. Wilkinson did not order the agents to search the basement and Merlin intended to search the basement prior to Wilkinson's comment. While Falk accompanied Merlin and Wells into the basement, only Merlin and Wells searched the basement.

¶ 20. Despite Wheat's contentions, there is no credible evidence that Merlin was a "stalking horse" of the Kenosha police department. A "stalking horse" is "[s]omething used to cover up one's true purpose; a decoy." *Id.* at ¶ 22 (citation omitted). In determining whether a search is a police or probation search, a "stalking horse" is a probation officer who uses his or her authority to help the police evade the warrant requirements of the Fourth Amendment. *Id.*

¶ 21. Here, the search was instigated by the probation officer, not by law enforcement; a probation officer cannot be a "stalking horse" of law enforcement if the probation officer instigated the search. Information was provided by law enforcement to Merlin regarding Robinson's contact with Wheat merely as a courtesy and as part of normal operating procedure; Robinson did not ask that Merlin search Wheat's home. A search is not rendered unlawful merely because law enforcement provided some of the information that led to the search. *See State v. Flakes,* 140 Wis. 2d 411, 427, 410 N.W.2d 614 (Ct. App. 1987).

¶ 22. While law enforcement and probation may have cooperated with one another, cooperation does not transform a probation search into a police search. *Hajicek,* 2001 WI 3 at ¶ 32. Cooperation with law enforcement for the purpose of preventing crime is a specific goal of probation supervision. *Id.* at ¶ 33; *see also* WIS. ADMIN. CODE § DOC 328.01(5). The regulations in the Wisconsin Administrative Code provide that a specific goal of probation supervision is "[t]o cooperate with other public and private agencies in activities for

the purpose of prevention of crime and to provide alternatives to institutionalization." *Id.*

¶ 23. The trial court's findings of fact, coupled with the remaining facts of record, demonstrate that probation officer Merlin conducted the search and law enforcement officers Wilkinson and Falk were present only for protective purposes. Contrary to Wheat's assertions, we conclude that the search of his residence was a lawful probation search, not a law enforcement search. A suppression motion asserting that the search was an unlawful law enforcement search would have been unsuccessful. Trial counsel's failure to bring a meritless motion does not constitute deficient performance. *See State v. Harvey,* 139 Wis. 2d 353, 380, 407 N.W.2d 235 (1987); *State v. Cummings,* 199 Wis. 2d 721, 747 n.10, 546 N.W.2d 406 (1996).

¶ 24. Wheat also argues that the search was illegal because the evidence that formed the basis for the search, the information in Robinson's phone message to Merlin, was illegally obtained, which then contaminated the subsequent search. He specifically contends that when Robinson encountered him on the street, Robinson had no reasonable suspicion to believe that he was armed or dangerous and therefore the pat-down search should not have been conducted. We disagree that this evidence tainted the subsequent probation search of the house.

¶ 25. Assuming without deciding that the evidence was, in fact, obtained in violation of the Fourth Amendment, Wheat fails to provide any authority that holds that a reasonable probation search is unlawful when the probation officer relies, in part, on such information. Such evidence is admissible at a probation revocation hearing. WIS. ADMIN. CODE § HA 2.05(6)(c)

282

("Evidence gathered by means not consistent with ch. DOC 328 or in violation of the law may be admitted as evidence at the hearing."). If evidence obtained in violation of the Fourth Amendment is admissible to determine whether probation should be revoked, it should also be acceptable to consider whether to conduct a probation search.

¶ 26. Furthermore, the United States Supreme Court has held that the exclusionary rule does not bar the introduction of evidence seized in violation of a parolee's Fourth Amendment rights at a parole revocation hearing. *Pa. Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 359 (1998). We see little reason to distinguish between illegally obtained evidence leading to a parole revocation proceeding and illegally obtained evidence leading to a probation search. *See, e.g., Flakes*, 140 Wis. 2d at 426; *State v. Griffin*, 131 Wis. 2d 41, 53 n.4, 388 N.W.2d 535 (1986), *aff'd*, 483 U.S. 868 (1987) (holdings of each case apply equally to parolees and probationers).

¶ 27. The exclusionary rule is a judicially created means of deterring illegal searches and seizures but does not prohibit the introduction of illegally seized evidence in all proceedings or against all persons. *Pa. Bd. of Probation and Parole*, 524 U.S. at 363. Such application of the exclusionary rule would both hinder the functioning of state probation systems and alter the traditionally flexible, administrative nature of probation proceedings. *See id.* at 364.

¶ 28. Furthermore, application of the exclusionary rule to probation searches would have little deterrent effect upon an officer who is unaware that the subject of his or her search is a probationer. *See id.* at 367. The officer will likely be searching for evidence of

criminal malfeasance with an eye toward the introduction of the evidence at a criminal trial. *Id.* The likelihood that illegally obtained evidence will be excluded from trial provides deterrence against Fourth Amendment violations but the remote possibility that the subject is a probationer and the evidence could be used to search his or her home will have little, if any, effect on the officer's incentives. *See id.* (the remote possibility that the subject is a parolee and that the evidence may be admitted at a parole revocation proceeding has little effect on the officer's incentives).

¶ 29. A reasonable probation search, as conducted here, is lawful even if the probation officer relies, in part, on information from law enforcement officials in violation of the Fourth Amendment. Any motion to suppress by trial defense counsel would have been unsuccessful on these grounds as well.

## CONCLUSION

¶ 30. Trial defense counsel was not ineffective for failing to bring a meritless motion. The search of Wheat's house was a probation search, not a law enforcement search. Furthermore, a reasonable probation search is lawful even if premised, in part, on information obtained in violation of the Fourth Amendment by law enforcement. We therefore affirm the judgment of conviction and order denying postconviction relief.

*By the Court.*—Judgment and order affirmed.